**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

**CASE NO. 9:23-cv-81539**

RAJENDRA K. BANSAL, RANISAUR LLC,
SRINIVAS KAZA MD, LLC, ADVANCED
IMAGING SPECIALISTS, P.A.,
NONA MINIMALLY INVASIVE SURGERY,
PLLC, CHIRAG J. PATEL, KRISHMA
PATEL, KISHORE DASS, individually and as
trustee of the DASS FAMILY TENANCY BY
THE ENTIRETIES TRUST DATED
DECEMBER 14, 2006, SEEMA DASS,
individually and as trustee of the DASS
FAMILY TENANCY BY THE ENTIRETIES
TRUST DATED DECEMBER 14, 2006,
KDSD, LLC, MAJID RIZVI, and FARHAT
RIZVI,

      Plaintiffs,

v.

TD AMERITRADE, INC. and CHARLES
SCHWAB FUTURES AND FOREX LLC f/k/a
TD AMERITRADE FUTURES & FOREX,
LLC,

      Defendants.

_____/

**<u>COMPLAINT</u>**

     Plaintiffs Rajendra K. Bansal, Ranisaur LLC, Srinivas Kaza MD, LLC, Advanced Imaging

Specialists, P.A., Nona Minimally Invasive Surgery, PLLC, Chirag J. Patel, Krishma Patel,

Kishore Dass, individually and as trustee of the Dass Family Tenancy by the Entireties Trust Dated

December 14, 2006, Seema Dass, individually and as trustee of the Dass Family Tenancy by the

Entireties Trust Dated December 14, 2006, KDSD, LLC, Majid Rizvi, and Farhat Rizvi

(collectively, "Plaintiffs") sue Defendants TD Ameritrade, Inc. ("TDA") and Charles Schwab

Futures and Forex LLC f/k/a TD Ameritrade Futures & Forex LLC ("Schwab"), and allege as follows:

**INTRODUCTION**

1.      This is an action for aiding and abetting fraud, aiding and abetting breach of fiduciary duty, aiding and abetting violation of the Commodity Exchange Act, unjust enrichment, and negligence against TDA and Schwab for enabling fraudulent scheme orchestrated by Rajiv Patel ("Mr. Patel") through a company called Bluprint LLC.

2.      Using accounts at TDA and Schwab, Mr. Patel and Bluprint engaged in a fraudulent scheme to solicit investor funds for the purported purpose of trading commodity futures and securities in a commodity pool.   In reality, the TDA and Schwab accounts were used to misappropriate Plaintiffs' funds and operate a classic Ponzi scheme.   Mr. Patel and Bluprint raised at least $11.8 million from at least sixteen investors, including Plaintiffs.

3.      TDA and Schwab knew of and substantially assisted the Bluprint scheme.   Indeed, TDA permitted large third-party wire transfers from investors into the TDA account, in violation of its own policies and procedures.   TDA reviewed and approved each of those third-party investor transfers, which were expressly earmarked for investment in Bluprint.   Defendants also knew that the transfers into and activity in the accounts after the inception of the fraudulent scheme were inconsistent with Defendants' Know Your Customer information, particularly as the activity was in stark contrast to how the account was used for 17 years prior to the fraudulent scheme. Defendants knew that there was a consistent influx of investor funds, mostly repeat investors, even though it also knew the accounts were not profitable.

4.      The use of the accounts at TDA and Schwab were integral to the scheme to defraud investors.   Despite their knowledge of the fraudulent scheme, Defendants substantially assisted

Mr. Patel and Bluprint by allowing them to continue using the accounts, in violation of TDA and Schwab's own policies.

## **PARTIES**

5.      Plaintiff Rajendra K. Bansal is a resident and citizen of Palm Beach County, Florida.

6.      Plaintiff Ranisaur LLC is a Florida limited liability company with its principal place of business in Palm Beach County, Florida.  Its members are residents and citizens of Palm Beach County, Florida.

7.      Plaintiff Srinivas Kaza MD, LLC, is a Florida limited liability company with its principal place of business in Palm Beach County, Florida.  Its members are residents and citizens of Palm Beach County, Florida.

8.      Plaintiff Advanced Imaging Specialists, P.A. is a Florida corporation with its principal place of business in Palm Beach County, Florida.

9.      Plaintiff Nona Minimally Invasive Surgery, PLLC, is a Florida professional limited liability company with its principal place of business in Orange County, Florida.  Its members are residents and citizens of Orange County, Florida.

10.     Plaintiff Chirag J. Patel is a resident and citizen of Orange County, Florida.

11.     Plaintiff Krishma Patel is a resident and citizen of Orange County, Florida.

12.     Plaintiff Kishore Dass is a resident and citizen of Palm Beach County, Florida.

13.     Plaintiff Seema Dass is a resident and citizen of Palm Beach County, Florida.

14.     Plaintiff KDSD, LLC is a Florida limited liability company with its principal place of business in Palm Beach County, Florida.  Its members are residents and citizens of Palm Beach County, Florida.

15.     Plaintiff Majid Rizvi is a resident and citizen of the State of Illinois.

16.     Plaintiff Farhat Rizvi is a resident and citizen of the State of Illinois.

17.     Defendant TDA is a New York corporation with its principal place of business in Omaha, Nebraska.  TDA is registered to do business in Florida.  TDA conducts business and has customers all over the world, including in the Southern District of Florida. TDA operates as a brokerage and trading institution which allows retail customers to trade using TDA's online trading platform. TDA's platform brings execution and clearing services and allows for the online trade of assets such as futures and stocks for retail customers. TDA is regulated under the Commodity Exchange Act, among other federal and state securities and commodities laws.

18.     TDA has hundreds of offices across the country, including offices within this District.  TDA is one of the nation's largest discount brokerage firms and is a wholly owned subsidiary of The Charles Schwab Corporation.  At all relevant times, TDA conducted business in this District, where it provided its services to Mr. Patel.

19.     Defendant Schwab is a Delaware limited liability company.  Upon information and belief, Schwab's sole member is TD Ameritrade Online Holdings Corp., which is a Delaware corporation with its principal place of business in Omaha, Nebraska.

20.      Prior to a name change in September 2021 as part of a buy-out, Schwab was known as TD Ameritrade Futures & Forex LLC.  Schwab and TDA are affiliated corporations pursuant to Schwab's purchase of TDA, and both Schwab and TDA are under the umbrella of The Charles Schwab Corporation.

21.     Schwab operates as a futures commission merchant that solicits and accepts orders to buy or sell futures contracts for consumers. It is regulated under the Commodity Exchange Act, among other federal and state securities and commodities laws.

22.     Schwab is engaged in, among other things, providing futures and foreign exchange trade execution services to clients of TDA.  At all relevant times, Schwab conducted business in this District, where it provided its services to Mr. Patel.  Like TDA, Schwab is a subsidiary of The Charles Schwab Corporation.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because the parties are citizens of different states, and the controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

24.     This Court has personal jurisdiction over Defendant TDA and Defendant Schwab because each of those Defendants received funds from and/or traceable to Bluprint's investors located in the Southern District of Florida and from Mr. Patel, who was operating, conducting, engaging in, and carrying on a fraudulent business or business venture in, among other locations, the Southern District of Florida.  Defendants each also received transfers comprised of commissions and fees from trading in the TDA Brokerage Account #4195 and Schwab Futures Account #F880 that were comprised of investor deposits and proceeds from Bluprint's fraudulent scheme conducted in the Southern District of Florida.  Defendant TDA also directly received investor deposits from investors located in this District and those deposits were intended and marked for trading in the Bluprint investment scheme carried out in this District.

25.     Defendant Schwab also received transfers representing commissions and fees incurred from trading in the Schwab Futures Account #F880 that were comprised of investor deposits and proceeds from Bluprint's fraudulent scheme conducted in the Southern District of Florida.

26.     Mr. Patel was the managing director and Chief Executive Officer of Bluprint.  Mr.

Patel operated Bluprint from its headquarters in Wellington, Florida, the transactions involving Mr. Patel, TDA, and Schwab were carried out in Florida, the Transfers originated from the TDA Brokerage Account #4195 and Schwab Futures Account #F880 located in Florida, and the misconduct described herein took place in Florida.

27.     The Court also has jurisdiction over each of the Defendants because they both regularly conduct business and recruit and serve customers in the State of Florida, including in this District.

28.     This Court has personal jurisdiction over both Defendants because each regularly and systematically operates, conducts, engages in and carries out a business or business venture in Florida, and because each has an office or agency in Florida.

29.     Venue is proper in this District pursuant to 7 U.S.C. § 25(c) because the Defendants are found and transact business in this District.  Venue is also proper pursuant to 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction in this district and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## **FACTUAL ALLEGATIONS**

**A.**     **The Fraudulent Scheme**

30.     Mr. Patel and his wife held a joint TDA account with number ending in #4195 at TDA (the "TDA Brokerage Account #4195") for nearly 19 years, from July 2002 until March 2021.

31.     The Patels also had a joint futures and forex trading account with number ending in #F880 with TD Ameritrade Futures & Forex LLC from August 2019 until March 2021, which account was transferred to Charles Schwab Futures and Forex LLC (the "Schwab Futures Account #F880"), which is under the umbrella of The Charles Schwab Corporation.

32.     From at least June 2019 through January 2022 (the "Relevant Period"), Mr. Patel, through Bluprint, orchestrated a fraudulent scheme to solicit investor funds, purportedly for the purported purpose of trading commodity futures and securities in a commodity pool.  Bluprint solicited at least $11.8 million from investors, including Plaintiffs.  Most of those funds were wired by investors directly into the TDA Brokerage Account #4195 and expressly earmarked for investment in Bluprint.  TDA reviewed and permitted those third-party transfers even though it was in violation of TDA's own policies.  Instead of using the funds to trade on behalf of Plaintiffs as represented, Mr. Patel immediately misappropriated the funds by depositing them into personal bank and trading accounts or using them to pay earlier investors.

33.     Mr. Patel solicited Plaintiffs to invest in Bluprint for the purpose of offering trading services for the benefit of investors.  Bluprint acted as a commodity pool operator ("CPO") by soliciting and receiving the funds from Plaintiffs, which were, in large part, deposited into the TDA Brokerage Account #4195.

34.     Mr. Patel advertised Bluprint as a company providing expertise in commodity futures trading and touted his extensive expertise and skill in identifying profitable trades on behalf of Bluprint's investors, with guaranteed returns for investors.  Mr. Patel held discretionary authority on how to invest Plaintiffs' money.  Plaintiffs were not involved in or informed of the daily trading activity, profits or losses, or otherwise.

35.     The TDA Brokerage Account #4195 used by Patel for the Bluprint investment scheme originally was opened by the Patels nearly 20 years ago for personal investing.  The account was used that way for 17 years until the inception of the fraudulent scheme.

36.     Prior to the creation of the Bluprint investment scheme, the TDA Brokerage Account #4195 had not been used to collect large deposits from third parties or to carry out high

volume or margin trading at the high levels of risk implemented during the Bluprint investment scheme.

37.     Upon the inception of the scheme in 2019, the account activity shifted dramatically. The TDA account began receiving a high volume of large wire transfers from third-party investors, including Plaintiffs, that were specifically earmarked for investment in Bluprint.  The volume of transfers from third parties and the high-volume trading with turn- around losses in both the TDA Brokerage Account #4195 and the Schwab Futures Account #F880 was unusual in character and degree for a personal trading account and in direct violation of TDA's and Schwab's policies.

38.     Instead of using the investment funds as promised, almost immediately upon receipt of Plaintiffs' deposits into the TDA Brokerage Account #4195, Mr. Patel and Bluprint misappropriated Plaintiffs investment funds by: (i) using the funds for personal high-risk trading, (ii) making payments to other investors, (iii) transferring the funds other bank accounts and spending them on personal expenses, and (iv) seamlessly transferring the funds from the TDA Brokerage Account #4195 to the Schwab Futures Account #F880 to fill personal trading orders entered by Mr. Patel and to cover margin calls incurred due to trading losses.

39.     On August 16, 2019, Mr. Patel opened the Schwab Futures Account #F880 with TD Ameritrade Futures and Forex, LLC (which was later transferred to Schwab) for the specific purpose of carrying out even more high-risk, margin trades of pooled Bluprint investor funds.

40.     Throughout the Relevant Period, Mr. Patel used the TDA Brokerage Account #4195 to sweep Bluprint investor deposits into trading platforms at TDA and Schwab.  Those platforms allowed for trading on margin thereby allowing for significant losses.

41.     TDA knew the TDA Brokerage Account #4195 held third-party investor funds earmarked for investment in Bluprint, not the Patels' personal money.  Despite that knowledge,

TDA not only failed to do anything to stop Mr. Patel from using the accounts, it further actively and knowingly assisted him, in a substantial departure from typical banking practices, by allowing him to open the Schwab Futures Account #F880 without any due diligence.

42.     To make matters worse, on October 2020, when Mr. Patel was suffering significant losses in the Schwab Futures Account #F880, he asked Schwab to increase his margin risk tolerance.   Schwab devised a method to do so by applying the Futures Intraday Margin requirements to the Schwab Futures Account #F880.

43.     The Bluprint fraud was perpetrated through and facilitated by the accounts held at TDA and Schwab for nearly two years.

44.     The TDA Brokerage Account #4195 and Schwab Futures Account #F880 operated like one account with a constant flow of investor funds marked for investment in Bluprint into the TDA Brokerage Account #4195 and an automated flow of those investor funds out of the TDA Brokerage Account #4195 at TDA and into the related Schwab Futures Account #F880 at Schwab.

45.     On March 19, 2021, allowing Mr. Patel to use the TDA Brokerage Account #4195 to receive, transfer, and trade Bluprint investor deposits in violation of TDA's own policies, and only after the TDA Brokerage Account #4195 and the Schwab Futures Account #F880 had been completely depleted, TDA sent the Patels and their children a letter terminating its relationships with them and closing all of their accounts, without further explanation.

46.     The Bluprint trading activity carried out through Defendants' trading platforms was never profitable and only incurred significant losses for Plaintiffs.  The funds invested in Bluprint never accumulated interest.  Meanwhile, Mr. Patel continued to solicit additional investments and provided false periodic account statements to Plaintiffs, falsely reporting that their investments were earning interest.

47.     Because Mr. Patel's trading activity was not generating sufficient revenues for Bluprint to pay the amounts guaranteed to the investors, Bluprint covered the significant shortfall primarily by using funds it obtained from new and repeat investors, and also by using the commingled proceeds of a significant loan it received from a lender, to return funds to earlier investors to perpetuate and conceal the scheme, to continue high-risk trading, and to make payments towards the loan.

48.     Mr. Patel controlled and operated Bluprint as a means to carry out the fraudulent scheme, thereby causing Bluprint to commit violations of commodity futures trading laws and rules, common law fraud, and breaching his fiduciary duties to Plaintiffs.  Bluprint was under the control of Mr. Patel until his death in January 2022 after the commencement of the CFTC Action.

49.     As a result of this fraudulent behavior, the CFTC commenced the CFTC Action against Mr. Patel and Bluprint that resulted in entry of the Preliminary Injunction finding that Bluprint engaged in fraud in connection with commodity futures and options transactions by making misrepresentations of material fact to pool participants.

50.     By November 21, 2021, Mr. Patel and Bluprint had depleted nearly all of the investors' funds. Plaintiffs lost at least $6.3 million through the trading activity in the TDA Brokerage Account #4195 and in the Schwab Futures Account #F880.

**B.     TDA Brokerage Account #4195 Was Used to Receive Plaintiffs' Bluprint Investments**

51.     On January 21, 2020, Plaintiff Rajendra K. Bansal sent a wire transfer for $1,000,000 to the TDA Brokerage Account #4195, with the memo line of the transfer stating, "[f]or further credit to acct 774244195 Rajiv Patel/Blueprint."  TDA advised Mr. Patel by email that it was reviewing this third-party deposit and that all such third-party deposits are subject to review and return.  TDA informed Mr. Patel that if the wire was accepted, it would be an exception

to TDA's inbound wire procedures which do not allow TDA to accept wires from third parties into accounts such as the TDA Brokerage Account #4195. TDA advised Mr. Patel that in the future it would not accept wires from third parties into the TDA Brokerage Account #4195.

52.     But, TDA violated its own policies and continued to accept large wires from third parties into the TDA Brokerage Account #4195.  TDA did not return the $1 million wire to Plaintiff Rajendra Bansal.  Nevertheless, TDA admittedly carefully reviewed all such third-party wires and saw the memo lines referencing Bluprint.  TDA then chose to make at least 22 additional exceptions to its inbound wire procedures and accepted at least that many third-party wires from investors into the TDA Brokerage Account #4195, including Plaintiffs, which were expressly earmarked for investment in Bluprint.

53.     On September 9, 2020, Plaintiff Ranisaur LLC sent a wire transfer for $500,000 to the TDA Brokerage Account #4195, with the memo line of the transfer stating, "for benefit acct 774244195 Rajiv Patel-Bluprint."

54.     On November 29, 2019, Plaintiff Srinivas Kaza MD, LLC, sent a wire transfer for $100,000 to the TDA Brokerage Account #4195, with the memo line of the transfer stating, "[f]or benefit of account #774244195 Rajiv Patel/Bluprint."

55.     On December 17, 2019, Plaintiff Srinivas Kaza MD, LLC, sent a wire transfer for $50,000 to the TDA Brokerage Account #4195, with the memo line of the transfer stating, "[f]or benefit of account #774244195 Rajiv Patel/Bluprint."

56.     On April 21, 2020, Plaintiff Srinivas Kaza MD, LLC, sent a wire transfer for $75,000 to the TDA Brokerage Account #4195, with the memo line of the transfer stating, "[f]or benefit of account #774244195 Rajiv Patel/Bluprint."

57.     On April 30, 2020, Plaintiff Srinivas Kaza MD, LLC, sent a wire transfer for

$75,000 to the TDA Brokerage Account #4195, with the memo line of the transfer stating, "[f]or benefit of account #774244195 Rajiv Patel/Bluprint."

58.    On June 17, 2020, Plaintiff Srinivas Kaza MD, LLC, sent a wire transfer for $50,000 to the TDA Brokerage Account #4195, with the memo line of the transfer stating, "[f]or benefit of account #774244195 Rajiv Patel/Bluprint."

59.    On July 17, 2020, Plaintiff Srinivas Kaza MD, LLC, sent a wire transfer for $80,000 to the TDA Brokerage Account #4195, with the memo line of the transfer stating, "[f]or benefit of account #774244195 Rajiv Patel/Bluprint."

60.    On August 28, 2020, Plaintiff Srinivas Kaza MD, LLC, sent a wire transfer for $25,000 to the TDA Brokerage Account #4195, with the memo line of the transfer stating, "[f]or benefit of account #774244195 Rajiv Patel/Bluprint."

61.    On September 25, 2020, Plaintiff Srinivas Kaza MD, LLC, sent a wire transfer for $70,000 to the TDA Brokerage Account #4195, with the memo line of the transfer stating, "[f]or benefit of account #774244195 Rajiv Patel/Bluprint."

62.    On October 20, 2020, Plaintiff Srinivas Kaza MD, LLC, sent a wire transfer for $100,000 to the TDA Brokerage Account #4195, with the memo line of the transfer stating, "[f]or benefit of account #774244195 Rajiv Patel/Bluprint."

63.    On January 27, 2021, Plaintiff Srinivas Kaza MD, LLC, sent a wire transfer for $25,000 to the TDA Brokerage Account #4195, with the memo line of the transfer stating, "[f]or benefit of account #774244195 Rajiv Patel/Bluprint."

64.    On October 8, 2019, Plaintiff Advanced Imaging Specialists, P.A., sent a wire transfer for $100,000 to the TDA Brokerage Account #4195, with the memo line of the transfer stating, "[f]or benefit of account #774244195 Rajiv Patel/Bluprint."

65.     On February 26, 2020, Plaintiff Advanced Imaging Specialists, P.A., sent a wire transfer for $75,000 to the TDA Brokerage Account #4195, with the memo line of the transfer stating, "[f]or benefit of account #774244195 Rajiv Patel/Bluprint."

66.     On April 21, 2020, Plaintiff Advanced Imaging Specialists, P.A., sent a wire transfer for $75,000 to the TDA Brokerage Account #4195, with the memo line of the transfer stating, "[f]or benefit of account #774244195 Rajiv Patel/Bluprint."

67.     On January 27, 2021, Plaintiff Advanced Imaging Specialists, P.A., sent a wire transfer for $15,000 to the TDA Brokerage Account #4195, with the memo line of the transfer stating, "[f]or benefit of account #774244195 Rajiv Patel/Bluprint."

68.     On October 21, 2020, Plaintiff Nona Minimally Invasive Surgery, PLLC, wired $300,000 to the TDA Brokerage Account #4195, with the memo line of the transfer stating, "investment for benefit of account #774244195 Rajiv patel/Bluprint."

69.     On February 2, 2021, Plaintiffs Chirag J. Patel and Krishma Patel sent a wire transfer for $75,000 to the TDA Brokerage Account #4195.

70.     On June 5, 2019, Plaintiffs Kishore Dass and Seema Dass sent a wire transfer for $300,000 to the TDA Brokerage Account #4195, with the memo line of the transfer stating, "for benefit of Rajiv Patel/Blueprint a/c#774244195."

71.     On March 18, 2020, Plaintiffs Kishore Dass and Seema Dass sent a wire transfer for $500,000 to the TDA Brokerage Account #4195, with the memo line of the transfer stating, "FBO account 774244195 Rajiv Patel/Bluprint."

72.     On May 22, 2020, Plaintiffs Kishore Dass and Seema Dass sent a wire transfer for $1,500,000 to the TDA Brokerage Account #4195, with the memo line of the transfer stating, "FBO Account 774244195 Rajiv Patel/Bluprint purpose investment."

73.      On August 12, 2019, Plaintiffs Kishore Dass and Seema Dass, as trustees of the Dass Family Tenancy by the Entireties Trust Dated December 14, 2006, sent a wire transfer for $100,000 to the TDA Brokerage Account #4195, with the memo line of the transfer stating, "FBO: A/C 774244195 Rajiv Patel/Bluprint."

74.      On February 8, 2019, Plaintiff KDSD, LLC, sent a wire transfer for $750,000 to the TDA Brokerage Account #4195.

75.      On August 12, 2019, Plaintiff KDSD, LLC, sent a wire transfer for $100,000 to the TDA Brokerage Account #4195, with the memo line of the transfer stating, "774244195 Rajiv Patel/Blueprint."

76.      On February 1, 2021, Plaintiffs Majid Rizvi and Farhat Rizvi sent a wire transfer for $200,000 to the TDA Brokerage Account #4195, with the memo line of the transfer stating, "[f]or benefit of account #774244195 Rajiv Patel/Bluprint."

77.      Defendant TDA received wires from Plaintiffs totaling over $6.4 million specifically earmarked for investment in Bluprint.  Thus, Defendants had actual knowledge that the TDA Brokerage Account #4195 and Schwab Futures Account #F880 held pooled Bluprint investor funds.

78.      Rather than stop Mr. Patel or decline to help him misuse Bluprint investor money, both Defendants executed his instructions to misappropriate investor money.

**C.      Mr. Patel and Bluprint Owed Fiduciary Duties to Plaintiffs**

79.      Mr. Patel and Bluprint had a duty to act for the benefit of Plaintiffs upon matters within the scope of their relationship.  Specifically, Mr. Patel and Bluprint had a duty to take Plaintiffs' money and use it to trade commodities on their behalf.

80.      In addition, Mr. Patel and Bluprint fostered a special relationship with Plaintiffs

that engendered fiduciary duties of loyalty, care, honesty and/or good faith.

81.     Mr. Patel and Bluprint knew that investors, including Plaintiffs, were relying on and trusting them to properly invest their hard-earned money.  Mr. Patel and Bluprint knew of and encouraged that reliance and trust.  Mr. Patel always represented himself as extremely wealthy and successful and advised Bluprint's investors that he was essentially doing them a favor in allowing them to pool their funds in the TDA Brokerage Account #4195 so that he could manage their funds as he did his personal funds and create similar wealth for Bluprint's investors.

82.     Mr. Patel had complete control over the TDA Brokerage Account #4195 and the Schwab Futures Account #F880.  Mr. Patel held discretionary authority on how to invest Plaintiffs' money.  Plaintiffs were not involved in or informed of the daily trading activity, profits or losses, or otherwise.

**D.      Defendants Knew About and Substantially Assisted the Fraudulent Scheme**

83.     Mr. Patel and Bluprint defrauded and breached their fiduciary duties to Plaintiffs by: (1) knowingly and intentionally operating Bluprint as a commodity pooling scheme and as a Ponzi scheme through the use of the accounts at TDA and Schwab; and (2) diverting Plaintiffs' funds deposited for personal high-risk trading and for his personal benefit. TDA and Schwab knowingly facilitated both aspects of Mr. Patel's ongoing fraudulent scheme and breaches of fiduciary duties to Plaintiffs thereby aiding and abetting Mr. Patel's fraud and breach of fiduciary duty.

84.     TDA and Schwab each had knowledge of Patel's Bluprint trading scheme derived from: (i) reviewing, processing, and accepting the third-party deposits of funds into the TDA Brokerage Account #4195 maintained at Defendant TDA via wire transfers that were specifically labeled for investment in Bluprint, in violation of TDA's own policies; (ii) opening of the Schwab

Futures Account #F880 at Schwab where Mr. Patel listed Bluprint as his employer; (iii) processing and accepting Mr. Patel's immediate transfer of third-party funds deposited in the TDA Brokerage Account #4195 to TDA's and Schwab's high-risk trading platforms and misuse of those funds in the Schwab Futures Account #F880 at Schwab and on TDA's margin trading platforms; (iii) witnessing how Mr. Patel's account management and investing style, commencing in June 2019, greatly differed from the Patels' investment style for the previous 17 years; (iv) witnessing that the accounts had little to no income and that Mr. Patel's account management and investment style commencing in June 2019 was not sustainable, yet the accounts still received a constant influx of investor funds, many of whom were repeat investors; (v) processing and transferring at Mr. Patel's direction funds to third parties using new third-party deposits labeled for investment in Bluprint and commingling third-party deposits with the Mr. Patels' personal funds and loan proceeds; (vi) preparation of account statements and demands for payment of margin debt evidencing that Mr. Patel's high-risk trading generated little or no revenue; and (vii) discharging of anti-money-laundering (AML)-related duties pertaining to suspicious transactions, "know your customer" and customer due diligence, both at onboarding and throughout the brokerage relationship with the Patels.

85.     With TDA and Schwab's assistance, Mr. Patel was able to pool investor funds, including Plaintiffs' funds, and to use new investor funds to carry out high-risk trading, for Mr. Patel's personal benefit, and to pay amounts owed to Bluprint's earlier investors thereby operating a Ponzi scheme through the Patels' accounts held with Defendants.

86.     TDA and Schwab facilitated the operation of a commodity pooling scheme and of a Ponzi scheme in the accounts, pursuant to Mr. Patel's instructions and transfer orders. Specifically, (i) Defendant TDA reviewed and processed high-dollar amount, electronic transfers

16

from third parties coming into the Patels' TDA Brokerage Account #4195 earmarked as investments in Bluprint in the memo line of the wire transfers; (ii) repeatedly permitting third-party wire transfers into the TDA Brokerage Account #4195 in violation of TDA's own policies; (iii) Defendant TDA, on Mr. Patel's instructions, swept investor funds from the TDA Brokerage Account #4195 to the Schwab Futures Account #F880 for high-risk, margin trading; (iv) Defendant Schwab carried out Mr. Patel's constant orders in a frenzied, day-trading style incurring significant losses and prompting automatic margin calls paid for by debiting the TDA Brokerage Account #4195; (v) Defendants TDA and Schwab together swept those funds out of the TDA Brokerage Account #4195 for payment of margin debts; (vi) Defendant TDA also transferred investor funds earmarked for investment in Bluprint out of the TDA Brokerage Account #4195 to personal accounts; (vii) Defendant TDA also transferred investor funds earmarked for investment in Bluprint out of the TDA Brokerage Account #4195 to various other futures trading merchants; (viii) Defendant TDA also transferred investor funds earmarked for investment in Bluprint out of the TDA Brokerage Account #4195 to Mr. Patel for personal expenses; (ix) Defendants TDA and Schwab both sat by and assisted in the rapid depletion of over $6 million in Plaintiffs' funds earmarked for investment in Bluprint; and (x) despite the significant losses in the accounts, both Defendants together collected over $414,086.96 in commissions and fees.

87.     TDA allowed Mr. Patel to pool third party funds earmarked for investment in Bluprint in the TDA Brokerage Account #4195 and then to trade them improperly in a commodity trading pool and to transfer away those funds to TDA and Schwab's high-risk trading platforms, for improper purposes, in breach of applicable commodity futures trading laws and in breach of Mr. Patel and Bluprint's fiduciary duties to Plaintiffs.

88.     Mr. Patel carried out this obvious pooling and Ponzi scheme for two years, until

March 2021, when TDA closed all of the Patel family's accounts at both TDA and Schwab after depleting both the TDA Brokerage Account #4195 and the Schwab Futures Account #F880 to $0.

89.    Defendants are subject to banking regulations designed to prevent them from disregarding or assisting in fraudulent and illegal behavior by their customers.  Compliance with those regulations required Defendants to learn about the Patels' businesses and backgrounds and account-related activities.

90.    Federal law requires banks to "know their customers" and understand their customers' banking behavior.  Under applicable regulations, a bank must maintain procedures that allow it to "form a reasonable belief that it knows the true identity of each customer."  31 C.F.R. §§ 1020.220(a)(1), (2).  Accordingly, banks are required to obtain information about the account holder for every account at the onboarding stage and throughout the banking relationship.

91.    Defendants are also bound by the Bank Secrecy Act (the "BSA"), which mandates that the bank must create, manage, and uphold a program to ensure adherence to additional anti-money laundering measures. *See* 12 C.F.R. § 21.21.  The BSA also applies to Defendant Schwab as a futures commission merchant. It requires financial institutions to implement various measures to prevent money laundering, terrorist financing, and other illegal financial activities.  Specifically, Defendants must: (1) institute a system of internal controls to guarantee ongoing BSA compliance; (2) undertake independent testing of the bank's compliance; (3) appoint an individual to oversee and monitor compliance; and (4) provide relevant personnel with appropriate training. Financial institutions must also file reports with the Financial Crimes Enforcement Network (FinCEN) for certain types of transactions, such as large deposits and suspicious activity.

92.    Defendants also must develop a customer due diligence program to assist in predicting the types of transactions, dollar volume, and transaction volume each customer is likely

to conduct.   Customer due diligence requires Defendants to identify their customers, report indications of suspicious activity, and assign a "customer risk rating."   Customer due diligence requires Wells Fargo to know what business the customer is in, and to understand the types of transactions a customer should, and actually does, make.   This enables the bank to identify unusual or suspicious transactions for each customer. The customer due diligence program provides banks with the ability to monitor the financial activity of its customers and predict the type and frequency of transactions in which they are likely to engage.

93.     Customer due diligence programs should be tailored to the risk presented by individual customers, such that the higher the risk presented, the more attention is paid. Where a customer is determined to be high risk (such as the Patels based on the high-volume trading), banks should gather additional information about the customer and accounts, including determining: (1) purpose of the account; (2) source of funds; (3) proximity of customer's residence to the bank; and (4) explanations for changes in account activity.

94.     The customer due diligence is required at the onboarding stage and continuously throughout the banking relationship.

95.     The Code of Federal Regulations outlines additional responsibilities of futures commission merchants to know your customer and prevent possible money schemes.  *See* 31 CFR §§1026.210, 1026.220.  It outlines that Defendant Schwab should: (1) conduct ongoing monitoring to identify and report suspicious activity; (2) implement a Customer Identification Program ("CIP") to enable TDA to know the true identity of the customer; and (3) understand the nature and purpose of the customer relationship for the purpose of developing a customer risk profile.  *Id.*

96.     Defendants and their personnel must be able to identify and take appropriate action once put on notice of any of a series of suspicious or improper behaviors set forth in the Federal

Financial Institutions Examination Council's ("FFIEC") Bank Secrecy Anti-Money Laundering Manual ("FFIEC Manual"), including: (1) repetitive or unusual fund transfer activity; (2) fund transfers sent or received from the same person to or from different accounts; (3) transactions inconsistent with the account holder's business; (4) transfers of funds among related accounts; (5) depositing of funds into several accounts that are later consolidated into a single master account; (6) large fund transfers sent in round dollar amounts; (7) multiple accounts established in various corporate names that lack sufficient business purpose to justify the account complexities; (8) multiple high-value payments or transfers between shell companies without a legitimate business purpose; (9) payments unconnected to legitimate contracts or revenue sources; (10) fund transfers containing limited content or related party information; (11) transacting businesses sharing the same address; and (12) an unusually large number of persons or entities receiving fund transfers from one company. *See* FFIEC BSA/AML Examination Manual, https://bsaaml.ffiec.gov/manual.

97. Here, Defendants engaged in a Know Your Customer analysis of the accounts and monitored the accounts for anomalous or suspicious behavior. Defendants collected and reviewed information about Mr. Patel and Bluprint's business operations, the source of its funds and the purpose of the accounts.

98. Having in their possession the financial information about the Patels, Bluprint, and all of Mr. Patel's banking transactions, acquired in part through Defendants' discharge of their BSA/AML-related duties, Defendants had actual knowledge of Bluprint's fraudulent scheme. Defendants facilitated and substantially assisted the scheme in violation of their obligations under federal laws and regulations and their own policies. Indeed, after having full knowledge of the change of the TDA Brokerage Account #4195 from a personal brokerage account to a high-volume, high-risk trading account funded by third-party investor deposits earmarked for

20

investment in Bluprint—in violation of TDA's policies—TDA and Schwab continued to do business with Mr. Patel allowing Mr. Patel to accept and misappropriate new investments from new unsuspecting victims.

99.     TDA and the Patels had a long relationship lasting nearly 20 years during which the Patels used their TDA Brokerage Account #4195 for personal investing until mid-2019.

100.    During the last 2 years of that brokerage-client relationship, and in violation of its own policies, TDA permitted the TDA Brokerage Account #4195 to receive at least $6,335,000 in 23 separate wire transfers from third parties (22 of which were specifically marked for investment in Bluprint in the memo line) plus a wire for $298,000 from a lender.

101.    The volume of transfers from third parties and the high-volume trading with turn-around losses in both the TDA Brokerage Account #4195 and the Schwab Futures Account #F880 was unusual in character and degree for a personal trading account and in direct violation of TDA's and Schwab's policies.

102.    TDA had actual knowledge of the receipt of these wire transfers from third parties into the TDA Brokerage Account #4195 as it processed, reviewed, and accepted each one of the transfers to allow them to clear in direct violation of TDA's policy prohibiting the acceptance of transfers from third parties into the TDA Brokerage Account #4195.

103.    TDA and Schwab both had actual knowledge that those transfers into the TDA Brokerage Account #4195 were swept into the brokerage and futures trading platforms for trading in short-term securities and futures positions at TDA and at Schwab.

104.    TDA had actual knowledge that those funds were also transferred to other trading institutions by wire transfer.

105.    TDA had actual knowledge that those funds were also used for personal expenses

such as to place a deposit on a luxury automobile and to fund a brokerage account held by Mr. Patel and his son.

106.    TDA and Schwab had actual knowledge that the high-risk trading resulted in significant losses.

107.    Importantly, Defendants knew that the accounts received *investor* funds.

108.    TDA had actual knowledge that the account management style for the TDA Brokerage Account #4195 dramatically changed from a personal investment account to a high-volume, risky, futures trading account using funds received from third-party investors.

109.    TDA and Schwab had actual knowledge that there was little to no income, yet a constant influx of new investor funds, often from repeat investors, to keep the margin trading debts paid and to allow for ongoing high-risk trading.

110.    Defendants knew that Mr. Patel and Bluprint owed fiduciary duties to victims, including Plaintiffs.  Defendants, through review and processing of incoming wires and through Know Your Customer and BSA inquiries, knew that Mr. Patel and Bluprint had a duty to act for the benefit of Plaintiffs.  Defendants also knew that Mr. Patel controlled the accounts and that Plaintiffs and other investors were relying on and trusting Mr. Patel and Bluprint to properly invest their money, and Mr. Patel had accepted that responsibility.

111.    Despite this knowledge of fraud and breaches of fiduciary duty, Defendants failed to timely act upon the accounts connected with Mr. Patel and Bluprint.  Defendants continued to accept deposits of investor money and carry out the transfers needed to consummate the fraud.

112.    Defendants' actions and inaction were integral to the scheme to defraud investors. Mr. Patel could not have carried out the scheme without first raising a large amount of funds from investors and then depositing and transferring those funds among accounts.

113.    Had Defendants not knowingly and substantially assisted the scheme from its inception, and/or had closed the accounts early on, none of the Plaintiffs would have suffered damages.

114.    Even though it recognized that the use of the TDA Brokerage Account #4195 and Schwab Futures Account #F880 was running afoul of applicable law and/or TDA's and Schwab's own policies and procedures, Defendants benefitted from the continued use of their accounts, which generated significant fees and the use of millions of dollars in deposits.

115.    Finally, once the accounts were depleted, only then did TDA suddenly and without explanation closed all Patel family accounts including the Schwab Futures Account #F880 (but not until TDA and Schwab unjustly enriched themselves with two years of fees and commissions).

116.    Neither TDA nor Schwab alerted any banking or trading authorities to the Bluprint pooling scheme or otherwise reported any suspicious activity that occurred in the accounts. Instead, they quietly and with a one-paragraph letter sent by TDA closed all of the accounts.

117.    As a result of the foregoing failure to notify any regulator or Ms. Patel, Mr. Patel, in March 2021, began trading Bluprint investor funds with various other trading institutions through which he continued to operate Bluprint as a Ponzi scheme without pause for 10 additional months, thereby increasing investor losses.

118.    During the Relevant Period, Defendants shared common ownership and were both part of the overall TD Ameritrade brand. They also allowed customers like the Patels to instantaneously transfer funds as intrabank transfers between the two Defendants.  The TDA Brokerage Account #4195 served as the depository account for the trading scheme.  Then, the TDA Brokerage Account #4195 was automatically swept to cover the trading orders and margin calls in the Schwab Futures Account #F880. As such, the two accounts functioned as one account.

Therefore, as to the conduct subject of this Complaint, Defendants are functionally integrated, and any actual knowledge and information relevant to the legal proceeding could be imputed to both Defendants.

**E.    The Scheme Collapsed**

119.    As a result of the fraudulent behavior, on January 18, 2022, the CFTC commenced the CFTC Action against Mr. Patel and Bluprint that resulted in entry of the Preliminary Injunction containing preliminary findings that Mr. Patel and Bluprint likely participated in a fraudulent commodity trading scheme.

120.    In the Preliminary Injunction, the Court determined that the record supported a finding that between at least "June 2019 and continuing through the date of service of the Statutory Restraining Order, January 21, 2022, at least sixteen third-party individuals and entities provided Patel and Bluprint a total of at least $11,830,000 for the purpose of investing in Bluprint and sharing in profits earned from Bluprint's investment ventures, which purportedly included trading commodity futures, among other things." *Id.* at p. 5.

121.    With respect to those third-party funds, the Court held that the record supported the CFTC's prima facie showing that during the Relevant Period,

> Patel and Bluprint engaged in fraud in connection with commodity futures and options transactions by making misrepresentations of material fact to pool participants, misappropriating pool participant funds, and issuing false account statements; engaged in fraud and deceit as a commodity pool operator (CPO) and associated person (AP) of a CPO; failed to register Bluprint as a CPO and filed to register as an AP of a CPO; commingled commodity pool funds; failed to operate a commodity pool as a separate entity; received pool participants' funds in a name other than that of the commodity pool; and failed to provide certain pool disclosure documents and other documents required to be provided to pool participants under Commission Regulations. Therefore, there is good cause to believe that Defendants, by and through their agents, principals, and control persons, have engaged in, are engaging in, or are about to engage in violations of Sections 4b(a)(1)(A)-(C), 4c(b), 4k(2), 4m(1), and 4o(1)(A)-(B) of the [Commodity Exchange] Act [(the "Act")], 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6c(b), 6k(2), 6m(1),

24

6o(1)(A)-(B), and Regulations 4.20(a)(1), (b), and (c), 4.21, 4.22, and 32.4, 17
C.F.R. §§ 4.20(a)(1), (b), and (c), 4.21, 4.22, 32.4 (2021).

Preliminary Injunction [CFTC Action, ECF No. 41, at pp. 14-15; *see also* Order Granting
Expedited Ex Parte Motion for Ex Parte Statutory Restraining Order and Granting Motion for
Expedited Discovery [ECF No. 11 at p. 3]; Corrected Order Granting Expedited Ex Parte Motion
for Ex Parte Statutory Restraining Order and Granting Motion for Expedited Discovery [ECF No.
14 at p. 3].

122.    Further, the Court ordered a continued freeze of Receivership Defendants' liquid
and illiquid assets, including funds held in bank and trading accounts in Defendants' names. *See*
Preliminary Injunction at p. 15. Finally, the Court held that the CFTC's requested relief of
disgorgement and restitution for pool participants was appropriate in this case. *See id.*

**F.    The Fraudulent Transfers**

123.    From February 2019 to March 2021, Defendant TDA received at least $97,022.72
in commissions and fees from the TDA Brokerage Account #4195, and from September 2019 to
March 2021, Defendant Schwab received at least $317,064.24 in commissions and fees from the
Schwab Futures Account #F880.  Thus, Defendants TDA and Schwab together paid themselves
significant commissions and fees totaling approximately $414,086.96 (collectively, the
"Transfers") from the voluminous trading occurring in the TDA Brokerage Account #4195 and
Schwab Futures Account #F880.  Those Transfers came directly from Bluprint investors' deposits
into the TDA Brokerage Account #4195 and swept into the Schwab Futures Account #F880.

124.    Plaintiffs earmarked their deposits into the TDA Brokerage Account #4195 as
investments in Bluprint.  They also entered into profit sharing agreements with Bluprint to govern
their investments in Bluprint. Thus, all deposits by investors into the TDA Brokerage Account
#4195 were funds of Bluprint. The TDA Brokerage Account #4195 and the Schwab Futures

Account #F880 were both funded with investor deposits.  When Defendants took the Transfers from the TDA Brokerage Account #4195 and Schwab Futures Account #F880, Defendants were taking the funds of Bluprint deposited by Bluprint's investors.

125.    80. The TDA Brokerage Account #4195 and the Schwab Futures Account #F880 suffered significant losses and never made any realized gains.

126.    All conditions precedent to the bringing of this action have occurred or been waived.

<u>**COUNT I**</u>
**Aiding and Abetting Fraud**

127.    Plaintiffs restate and reallege paragraphs 1 through 126 as if fully set forth herein.

128.    As set forth above, Mr. Patel and Bluprint perpetrated a fraud upon Plaintiffs through materially false and misleading statements and omissions.  Mr. Patel and Bluprint knew these statements to be false.  Among other fraudulent conduct, Mr. Patel and Bluprint:

   a.  falsely told Plaintiffs that they would pool their investments in the TDA Brokerage Account #4195 for the purpose of trading commodity futures for the Plaintiffs' benefit;

   b.  falsely promised Plaintiffs high guaranteed returns on their investments;

   c.  issued false account statements to Plaintiffs;

   d.  concealed from Plaintiffs that they were operating a Ponzi scheme by, among other unlawful acts, paying earlier investors with funds obtained from later investors; and

   e.  concealed from Plaintiffs that Mr. Patel and Bluprint misappropriated and misused millions of Plaintiffs' funds for improper purposes.

129.    Plaintiffs relied to their detriment upon those misrepresentations when they

invested with Bluprint, and when they chose to hold their investments or make additional investments in Bluprint.

130.     Defendants substantially assisted Mr. Patel and Bluprint, with knowledge that they were defrauding investors like Plaintiffs.  In connection with providing substantial and material assistance to Mr. Patel and Bluprint, Defendants knew of their role in the scheme, and acted knowingly in assisting.

131.     Defendants substantially benefited from their participation in the scheme, earning substantial fees from the accounts.

132.     As a direct and proximate result of Defendants aiding and abetting the fraud, Plaintiffs have suffered damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs respectfully demand judgment against Defendants for their damages; pre- and post-judgment interest; and such other and further relief as the Court deems just and proper.

## <u>COUNT II</u>
### Aiding and Abetting Breach of Fiduciary Duty

133.     Plaintiffs restate and reallege paragraphs 1 through 126 as if fully set forth herein.

134.     Mr. Patel and Bluprint fostered a special relationship with investors, including Plaintiffs, that engendered fiduciary duties of loyalty, care, honesty, and/or good faith.  They had a duty to act for the benefit of Plaintiffs upon matters within the scope of their relationship, which included the duty to take Plaintiffs' money and use it properly to invest on their behalf.  Plaintiffs reposed trust in Mr. Patel who assumed control and responsibility of their funds.

135.     During the Relevant Period, Mr. Patel had sole or nearly sole control over the Patels' TDA Brokerage Account #4195 and Schwab Futures Account #F880 which are the subject of this lawsuit.

136.     During the Relevant Period, Mr. Patel and Bluprint knowingly and intentionally engaged in a fraudulent investment scheme using the TDA Brokerage Account #4195 and Schwab Futures Account #F880.

137.     Mr. Patel and Bluprint breached their fiduciary duties by perpetrating the fraudulent scheme, by misappropriating, commingling and otherwise misusing investor funds, and otherwise acting as alleged herein in violation of his fiduciary duties to Plaintiffs.

138.     Defendants knew that Mr. Patel and Bluprint owed fiduciary duties to investors, including Plaintiffs.

139.     Defendants substantially assisted in the breaches of fiduciary duty with knowledge that these Mr. Patel and Bluprint were breaching those duties.

140.     As a direct and proximate result of Wells Fargo's aiding and abetting Mr. Patel and Bluprint's breaches of fiduciary duty, Plaintiffs have suffered damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs respectfully demand judgment against Defendants for their damages, including but not limited to profits made by Defendants relating to Mr. Patel and Bluprint; pre- and post-judgment interest; and such other and further relief as the Court deems just and proper.

## COUNT III
### Aiding and Abetting Violation of Commodity Exchange Act

141.     Plaintiffs restate and reallege paragraphs 1 through 126 as if fully set forth herein.

142.     TDA and Schwab each knowingly aided, abetted, counseled, induced, and/or procured the violations of the Commodity Exchange Act ("CEA") alleged herein.  TDA and Schwab did so knowing of Mr. Patel and Bluprint's violations of the law, and willfully intended to assist those violations in violation of 22(a)(1) of the CEA, 7 U.S.C § (a)(1).

143.    223. Section 22(a) of the CEA provides:

(1) Any person. . .who willfully aids, abets. . .a violation of this Act [7 USCS §§ 1, *et seq.*] shall be liable for actual damages resulting from one or more of the transactions referred to in subparagraphs (A) through (D) of this paragraph and caused by such violation to any other person –

***

(B) who made through such person any contract of sale of any commodity for future delivery (or option on such contract or any commodity); or who deposited with or paid to such person money, securities, or property (or incurred debt in lieu thereof) in connection with any order to make such contract;

(C) who purchased from or sold to such person or placed through such person an order for the purchase or sale of
(i) an option subject to section 4c of this Act. . .;
(ii) a contract subject to section 19 of this Act; or
(iii) an interest or participation in a commodity pool; or (iv) a swap.

7 U.S.C. § 25(a)(1)(B)-(C).

144.    Mr. Patel, through TDA and Schwab, made multiple option contracts at issue here

(the "Option Contracts") on behalf of investors, as provided in Section 25(a)(1)(B) of the CEA.

The Option Contracts are options on contracts for the future delivery of commodities, specifically,

an index of securities, as described in the CEA, 7 U.S.C. §§ 25(a)(1)(B) and 6b(e)(3).

145.    As described *supra*, Mr. Patel was defrauding Plaintiffs and other investors in

violation of 7 U.S.C § 6o (1), which states:

(1) It shall be unlawful for a commodity trading advisor, associated person of a commodity trading advisor, **commodity pool operator**, or associated person of a commodity pool operator, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—

(A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or

(B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

U.S.C § 6o (1) (emphasis added).

146.    TDA and Schwab each knew that Mr. Patel was engaged in very risky margin trading and losing large amounts of money, and that the account management of the TDA Brokerage Account #4195 and Schwab Futures Account #F880 was not sustainable.

147.    TDA and Schwab each knew that the TDA Brokerage Account #4195 received third- party funds and as a result was in possession of non-proprietary funds that Mr. Patel was collecting in the TDA Brokerage Account #4195 and trading through both the TDA Brokerage Account #4195 and Schwab Futures Account #F880 in a commodity pool in violation of the CEA sections requiring registration.

148.    By virtue of the conduct alleged above, TDA and Schwab each willfully and recklessly aided and abetted Patel's violations of the CEA, and thereby violated 7 U.S.C. § 25(a)(1)(A).

149.    As a direct and proximate result of TDA's and Schwab's violations of the CEA, Plaintiffs have suffered actual damages from the transactions involving the purchase and sale of commodity futures.

150.    The volume of transfers from third parties and the high-volume trading with turn-around losses in both the TDA Brokerage Account #4195 and the Schwab Futures Account #F880 was unusual in character and degree for a personal trading account and in direct violation of TDA's and Schwab's policies.

151.    A cursory review of the flow of funds into the TDA Brokerage Account #4195 and out to the Schwab Futures Account #F880 revealed that Mr. Patel was improperly investing for a commodity pool and should have prompted a closing of all of the Patels' accounts including the TDA Brokerage Account #4195 and the Schwab Futures Account #F880.

152.    Defendants both knew that Mr. Patel was running an improper commodity pool or

Ponzi scheme and was trading on behalf of other investors in the Patels' TDA Brokerage Account #4195 and Schwab Futures Account #F880, as evidenced by, among other things, Defendants' access to and knowledge of the account activity and account opening documents for those accounts and the abrupt closing of those and other Patel family accounts at TDA and Schwab.

153.    As a direct and proximate result of TDA's and Schwab's aiding and abetting Mr. Patel's violation of the CEA through the Patels' TDA Brokerage Account #4195 and Schwab Futures Account #F880, Plaintiffs have been damaged.

WHEREFORE, Plaintiffs respectfully demand judgment against Defendants for compensatory damages and/or restitution, interest, and costs incurred by Plaintiffs due to Defendants' aiding and abetting Mr. Patel's violations of the CEA.

**COUNT IV**
**Fraudulent Transfer under § 726.105(1)(a), Fla. Stat.,**
**Florida Uniform Fraudulent Transfer Act**

154.    Plaintiffs restate and reallege paragraphs 1 through 126 as if fully set forth herein.

155.    This is a claim to avoid and recover fraudulent transfers pursuant to Florida Statutes Section 726.105(1)(a).

156.    Plaintiffs are creditors of Mr. Patel and of Bluprint, as the term "creditor" is defined in the Florida Uniform Fraudulent Transfer Act.

157.    Because the Transfers were fraudulent under Florida Statutes Section 726.105(1)(a), Plaintiffs may avoid the Transfers, pursuant to Florida Statutes Section 726.109(2).

158.    As detailed above, Bluprint, through Mr. Patel, made the Transfers of funds and/or assets totaling $414,086.96 to and for the benefit of Defendants TDA and Schwab.

159.    The Bluprint funds transferred to TDA and Schwab were derived from Bluprint's investors, including Plaintiffs. Those funds had been deposited into the Patels' TDA Brokerage

Account #4195 at TDA and swept into the Patels' Schwab Futures Account #F880 at Schwab.

160.    Defendants TDA and Schwab together received the Transfers totaling at least $414,086.96 from the Patels' TDA Brokerage Account #4195 and Schwab Futures Account #F880.

161.    Bluprint did not receive reasonably equivalent value in exchange for the Transfers.

162.    At the time of the Transfers, Mr. Patel was operating Bluprint as a fraudulent scheme and Ponzi scheme to the detriment of Bluprint, its investors and creditors.

163.    As a result of operating a commodity pooling and Ponzi scheme, Mr. Patel and Bluprint were insolvent, undercapitalized, and operating at a loss.  During all relevant times, Mr. Patel and Bluprint did not have sufficient assets to pay its debts to investors and/or creditors as those debts became due.

164.    Bluprint, through Mr. Patel, made the Transfers to TDA and Schwab in furtherance of that fraudulent scheme and Ponzi scheme.

165.    At the time that Mr. Patel directed the trading activity leading to the Transfers, Mr. Patel removed and/or concealed assets of Bluprint from the reach of its investors and creditors, including Plaintiffs.

166.    The transfers were made with the actual intent to delay, hinder, or defraud creditors of Bluprint, and made the Transfers to delay, hinder, or defraud those creditors.  Consequently, the Transfers were inherently fraudulent pursuant to Florida Statutes Section 726.105(1)(a).

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendant TDA and Defendant Schwab, jointly and severally: (1) determining that the Transfers of Bluprint funds to both Defendants were fraudulent and avoiding those Transfers for the benefit of Plaintiffs; (2) entering a money judgment against both Defendants in the full amount of the

Transfers they received, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such Transfers; and (3) awarding Plaintiffs damages, costs, prejudgment interest, and post-judgment interest.

### COUNT V
### Fraudulent Transfer under § 726.105(1)(b), Fla. Stat.,
### Florida Uniform Fraudulent Transfer Act

167.    Plaintiffs restate and reallege paragraphs 1 through 126 as if fully set forth herein.

168.    This is a claim to avoid and recover fraudulent transfers pursuant to Florida Statutes Section 726.105(1)(b).

169.    Plaintiffs are creditors of Mr. Patel and Bluprint, as the term "creditor" is defined in the Florida Uniform Fraudulent Transfer Act.

170.    The Transfers were made to Defendants without Bluprint receiving reasonably equivalent value in exchange.  In fact, TDA did not provide *any* value to Bluprint.

171.    Any services that Defendants may have provided to the Mr. Patel only facilitated and perpetuated the fraud and depletion of Bluprint's assets.  The Transfers only increased the damages Bluprint owes to its investors and creditors.

172.    The Transfers occurred when Bluprint was insolvent or Bluprint became insolvent as a result of the Transfers.

173.    The Transfers occurred when Bluprint was engaged in business or a transaction or was about to engage in business or a transaction where its remaining assets were unreasonably small in relation to the business or transactions.

174.    The Transfers occurred when Bluprint intended to incur or believed, or reasonably should have believed, that it would incur debts beyond its ability to pay as they became due.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against

Defendant TDA and Defendant Schwab, jointly and severally: (1) determining that the Transfers of Bluprint funds to Defendants were fraudulent and avoiding those Transfers for the benefit of Plaintiffs; (2) entering a money judgment against Defendants in the full amount of the Transfers they received, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such Transfers; and (3) awarding Plaintiffs damages, costs, prejudgment interest, and post-judgment interest.

**COUNT VI**
**Unjust Enrichment**

175.    Plaintiffs restate and reallege paragraphs 1 through 126 as if fully set forth herein.

176.    Defendants provided account services to Mr. Patel and Bluprint and those accounts were used to carry out the Ponzi scheme.

177.    The funds held in the accounts belonged to investors, including Plaintiffs.  Thus, Plaintiffs conferred benefits upon Defendants in the form of deposits from which Defendants generated income, including but not limited to interest, transfer fees, service fees, transaction fees and online banking fees.  Defendants knowingly and voluntarily accepted, and retained, the deposits and those benefits.

178.    Because Defendants aided and abetted Mr. Patel and Bluprint's fraud and breach of fiduciary duty, it would be inequitable for Defendants to retain the benefits it generated from Plaintiffs' monies.

179.    WHEREFORE, Plaintiffs respectfully demand judgment against Defendants for the return of income and fees retained by Defendants; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

## COUNT VII
### Negligence

180.    Plaintiffs restate and reallege paragraphs 1 through 126 as if fully set forth herein.

181.    A fiduciary relationship existed between Mr. Patel and Bluprint on the one hand and Plaintiffs on the other hand.

182.    Defendants knew or should have known of this fiduciary relationship.

183.    Defendants had actual knowledge that its accountholder, Mr. Patel, was misappropriating Plaintiffs' funds.

184.    Defendants therefore had a duty of care to Plaintiffs.

185.    Defendants breached that duty of care by continuing to allow Mr. Patel and Bluprint to conduct account services with Defendants and failing to close the accounts.

186.    As a direct and proximate result of that breach, Plaintiffs suffered damages.

WHEREFORE, Plaintiffs respectfully demand judgment against Defendants for their damages, including but not limited to profits made by Defendants relating to Mr. Patel and Bluprint; pre- and post-judgment interest; and such other and further relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable.

Dated: December 5, 2023

Respectfully submitted,

**LEVINE KELLOGG LEHMAN
SCHNEIDER + GROSSMAN LLP**
Miami Tower
100 SE 2nd Street, 36th Floor
Miami, FL 33131
Telephone: (305) 403.8788
Facsimile: (305) 403.8789

By: */s/Jeffrey C. Schneider*
Jeffrey C. Schneider
Florida Bar No. 933244
Email: jcs@lklsg.com
Secondary: ph@lklsg.com
Victoria J. Wilson
Florida Bar No. 92157
Email: vjw@lklsg.com
Secondary: cf@lklsg.com